**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN R. MURROW,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | **No. 14 CV 4036** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant John Murrow seeks judicial review under 42 U.S.C. § 405(g) of a final

decision of Defendant Commissioner of the Social Security Administration ("SSA")

denying his claim for Social Security Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act ("the Act").  *See* 42 U.S.C. §§ 416 and 423.  The parties have

consented to the jurisdiction of the United States Magistrate Judge pursuant to 28

U.S.C. § 636(c).  For the reasons that follow, Claimant's motion for summary judgment

(dkt. 17) is denied and the Commissioner's motion for summary judgment (dkt. 23) is

granted.

**I.     BACKGROUND**

**A.     Procedural History**

On November 21, 2012, Claimant filed a Title II DIB application alleging a

disability onset date of June 9, 2012 due to severe depression and anxiety disorder,

impairment of executive functions, and persistent migraine headaches.  (R. 82.)  His

initial claim was denied on February 27, 2013 and again upon reconsideration on May

23, 2013.  (R. 111, 118.)  After both denials, Claimant filed a hearing request on June 17, 2013 pursuant to 20 C.F.R. § 404.929 *et seq.*  (R. 120-21.)  A hearing was scheduled on October 28, 2013 before an Administrative Law Judge ("ALJ").  (R. 136.)  Claimant appeared along with his representative.  (R. 36-74.)  A Medical Expert ("ME") and a Vocational Expert ("VE") were also present and offered testimony.  (*Id.*)

### B.    Medical Evidence

Records reveal that Claimant is a patient of the Northwestern Medical Faculty Foundation ("NWFF").  (R. 245-312.)  In July 2011, he visited NWFF's medical center for treatment of his varicose veins through sclerotherapy.  (R. 245, 249.)  On October 28, 2011, he returned to NWFF's medical center for a physical exam.  (R. 251.)  He was diagnosed with classical migraines and depressive disorder.  (*Id.*)  Claimant stated he felt he should see a mental health specialist because his depression seemed to be worsening.  (R. 256.)  It was noted that Claimant "has thought about death but has never been actively suicidal."  (*Id.*)  On December 14, 2012, Claimant returned to NWFF's medical center for another physical exam.  (R. 300.)  The attending physician noted that Claimant reported feeling worse due to his depression and that he was absent from work for most of the year because of it.  (*Id.*)  He had been seeing a psychiatrist and slowly getting better, though he reported he was not yet ready to return to work.  (*Id.*)

On November 20, 2012, Dr. Henry Conroe, Claimant's treating psychiatrist, completed a psychiatric report for Disability Determination Services ("DDS").  (R. 315-18.)  Dr. Conroe indicated that he had been treating Claimant since May 2012.  (R. 315.)  In the report, Dr. Conroe opined that Claimant's depression began in September

2011 and has made it difficult for him to focus on work and interact with others.  (*Id.*)

Dr. Conroe found that Claimant displayed suicidal, homicidal and hopeless thought content, but otherwise was logical and coherent.  (R. 316.)  He also noted that Claimant's memory was intact and unimpaired.  (*Id.*)  Dr. Conroe had prescribed Lexapro to treat Claimant's depressive disorder.  (R. 317.)  Dr. Conroe found that Claimant did not have any serious limitations in his ability to complete household duties, independently initiate, sustain, or complete tasks, or understand, carry out, and remember instructions on a sustained basis.  (*Id.*)  However, he remarked that Claimant did have serious limitations in his ability to respond appropriately to supervision, coworkers, or customary work pressures because he "easily feels overwhelmed and becomes irritated with others."  (*Id.*)  He also found Claimant to be seriously limited in his ability to perform tasks on a sustained basis because "his stress tolerance is low and he easily feels frustrated."  (R. 318.)

In a letter dated December 18, 2012, Claimant's social worker Mr. Gregg Kitzis explained that he had provided counseling for Claimant over 38 sessions since November 3, 2011.  (R. 319.)  He noted a diagnosis of major depressive disorder, a history of asthma, heart problems and headaches.  (*Id.*)  Mr. Kitzis explained that Claimant "reports extreme anxiety and inability to function in his most recent employment," as well as difficulty concentrating, completing work or interacting appropriately with his co-workers.  (*Id.*)  Mr. Kitzis stated that although Claimant had found counseling useful and was in less distress, Claimant reported that he was unable to return to the environment at his most recent employment.  (*Id.*)

On January 22, 2013, Claimant underwent an internal medicine consultative exam with Dr. Lianna Palacci, an osteopathic physician. (R. 320-23.) Dr. Palacci noted that Claimant has a history of migraines that were diagnosed 15 years ago. (R. 321.) His migraines were generally accompanied with nausea and occasional sensitivity to light and sound. (*Id.*) Dr. Palacci also noted that Claimant has a history of depression and anxiety that was diagnosed in his early 20s. (*Id.*) Claimant was medicating his depression and anxiety with Lexapro and Xanax. (*Id.*) He did not have psychiatric hospitalizations, crying spells, paranoid delusions, or auditory hallucinations. (*Id.*) Claimant displayed normal results in his physical exam, including normal gait, normal neck, lungs, and cardiac function. (R. 322.) Dr. Palacci's clinical impression was that Claimant suffered from poorly controlled migraines and a history of depression and anxiety. (R. 323.)

On May 28, 2013, Dr. Conroe completed a Mental Residual Functional Capacity ("RFC") Questionnaire for Claimant. (R. 325-29.) Dr. Conroe reported that he sees Claimant once a month for approximately 30 to 45 minutes. (R. 325.) He has diagnosed Claimant with major recurrent depression, occupational and family stress, and dysthymic disorder. (*Id.*) Claimant was prescribed Lexapro and had been undergoing psychotherapy treatments with his social worker Mr. Kitzis. (*Id.*) Dr. Conroe identified several of Claimant's symptoms, such as thoughts of suicide, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, recurrent obsessions or compulsions which are a source of marked distress, and emotional lability. (R. 326.) As for Claimant's mental abilities and aptitudes, Dr. Conroe opined that Claimant would be seriously limited, but not precluded, in the areas of

maintaining attention for two hour segments, completing a normal workday and workweek without interruptions, and dealing with normal work stress. (R. 327.) Dr. Conroe explained that Claimant's stress tolerance is reduced for even routine tasks because "he easily feels overwhelmed with increased irritability and withdrawal." (*Id.*) Dr. Conroe further opined that Claimant would be unable to deal with stress of semiskilled and skilled work to meet competitive standards because his decreased stress tolerance would cause interference. (R. 328.) Dr. Conroe concluded that Claimant would be absent from work for more than four days per month due to his impairments. (R. 329.)

On October 7, 2013, Dr. Conroe completed another Mental RFC Questionnaire for Claimant. (R. 338-43.) Dr. Conroe diagnoses remained the same. (R. 338.) Dr. Conroe added another symptom to the list and opined that Claimant was seriously limited but not precluded in his ability to respond appropriately to changes in a routine work setting. (R. 340.) Dr. Conroe further opined that Claimant has moderate limitations in maintaining social functioning and he had moderate deficiencies in concentration, persistence, and pace. (R. 342.) Though he previously opined that Claimant would be absent from work more than four days per month, in the current questionnaire, Dr. Conroe believed that Claimant would be absent about three days per month. (*Id.*)

Also included in the record are some treatment notes from Dr. Conroe from 2013. (R. 350-59.) The handwritten notes are for mostly illegible.

Mr. Kitzis completed a mental RFC questionnaire for Claimant on October 8, 2013. (R. 331-36.) Claimant had attended 60 sessions with Mr. Kitzis since November

3, 2011 and 21 appointments from December 22, 2012 to October 8, 2013. (R. 331.)

Mr. Kitzis provided individual counseling to Claimant and noted that though Claimant found counseling helpful, he continued to "report [an] inability to return to previous work environment." (*Id.*) Mr. Kitzis opined that there were no signs of thought disorder, delusions, or hallucinations. (*Id.*) Claimant's memory was grossly intact and though he had some suicidal/homicidal ideation, he denied any plan or intent. (*Id.*) Mr. Kitzis found Claimant's insight and judgment to be normal. (*Id.*) Mr. Kitzis found that Claimant displayed a number of symptoms, such as thoughts of suicide, feelings of guilt or worthlessness, impairments in impulse control, generalized persistent anxiety, mood disturbance, persistent disturbances of mood or affect, apprehensive expectations, and sleep disturbances. (R. 332.) He further opined that Claimant would be seriously limited, but not precluded from getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes and dealing with normal work stress. (R. 333.) He found the same for Claimant's ability to deal with stress of semiskilled or skilled work. (R. 334.) With regard to functional limitations, Mr. Kitzis opined that Claimant was moderately deficient in the areas of concentration, persistence, and pace. (R. 335.) In all other categories, including social functioning, Mr. Kitzis found only "none-mild" limitations.

### C. Claimant's Testimony

Claimant was present with his attorney at the October 28, 2013 hearing before the ALJ. (R. 36-74.) Claimant is 58 years old and lives with his partner. (R. 40.) He has an undergraduate degree and has been working at financial institutions since 1999. (R. 41, 197.) His most recent position was that of a chief administrative officer for the

international banking division of a financial institution.  (R. 42.)  He stopped working in June of 2012 because he began to experience severe depression.  (*Id.*)  Claimant testified that he began treatment around two years ago but the depression got worse.  (*Id.*)  He further testified that in May 2012, he considered committing suicide by jumping out of the window of his hotel room but did not carry out his plan.  (*Id.*)  He did not go to the hospital after that incident.  (*Id.*)

Claimant testified that he began to see Dr. Conroe who prescribed Lexapro to help with his depression.  (R. 43.)  Claimant further testified that he is capable of taking care of his personal hygiene and can clean and perform household chores.  (R. 43-44.)  Though he gets distracted easily, Claimant's partner creates lists for him to keep him on track with his chores.  (R. 44.)  Regarding his depression, Claimant testified that he has experienced depression all his life but that this recent episode was the one that lasted the longest.  (R. 45.)  Claimant also testified that he experiences severe headaches and can have upwards of three during a week.  (*Id.*)  He was prescribed Imitrex for his headaches and testified that he has been "on and off" with the medication.  (R. 45-46.)  Claimant testified that he does not like taking the Imitrex because he becomes agitated and aggressive the following day.  (R. 46.)  He did explain though that if he feels a headache coming on, he can take Excedrin, which sometimes stops the headaches so that he does not have to take Imitrex.  (*Id.*)  Claimant stated he was hospitalized ten years ago because he had a persistent headache lasting a few days.  (*Id.*)  Claimant has not been hospitalized for headaches since that time.  (*Id.*)

Claimant testified that a week prior to the hearing, he experienced suicidal thoughts.  (R. 47.)  He stated that it was related to his family and the declining health of

his mother. (R. 48.) He further testified that he does not enjoy being around other people because he wants to harm himself and others. (R. 48.) Claimant testified that these feelings began a few years ago. (*Id.*) There were times where he would get "really angry" and "blurt out almost uncontrollably when [he] was upset." (*Id.*) Claimant further testified that these anger spurts are "impulses" and that he is "struggling to understand what triggers the impulses." (R. 55.) He testified that his doctors believe that his anger is related to his depression but Claimant does not understand why they happen. (R. 55.) Regarding performing tasks, Claimant testified that he has issues with memory and will often forget a task that he has started, like laundry. (R. 50-51.) He is often distracted and therefore feels he cannot focus on any one particular task. (R. 51.) He believes that he can accomplish contained and limited tasks. (R. 52.)

### D. Medical Expert's Testimony

An ME was present at the hearing and offered testimony regarding Claimant's condition. (R. 57.) The ME testified that Claimant has been diagnosed with major depressive disorder and dysthymic disorder. (R. 58.) He concluded that Claimant had mild restrictions in activities of daily living, mild to moderate restrictions in the areas of concentration, persistence, and pace, and moderate restrictions in social functioning. (*Id.*) The ME reasoned that Claimant feels intensely angry and has a sense of rage, but has not yet been hospitalized for this condition. (R. 59.) The ME further testified that though Claimant has obsessive tendencies, he is able to manage a daily routine fairly effectively. (R. 59.) The ME believed that Claimant would be best suited in an environment with brief and superficial workplace contacts. (R. 60.)

### E. Vocational Expert's Testimony

A VE was present and offered testimony during the hearing.  The VE determined that Claimant's past relevant work was most related to the position of marketing director under the Dictionary of Occupational Titles ("DOT").  (R. 62.)  The VE further described Claimant's past relevant work as sedentary and skilled, but opined that Claimant could not perform that work based on its complexity.  (*Id.*)

Next, the ALJ described an individual of Claimant's age, education and experience, who is limited to medium exertional positions, that involve simple routine, and repetitive tasks, with no interaction with the public, and only occasional interaction with coworkers and supervisors.  (R. 63.)  When asked what work such an individual could perform, the VE explained that he could work as a laundry laborer, transportation cleaner, or hospital cleaner.  (R. 63-64.)  In these positions, an individual must be on task for 90 percent of the workday and absences should not exceed ten per year.  (R. 64.)  With regard to the laundry cleaner position, the VE opined that the environment may be distracting because of the noisy equipment.  (R. 65.)  The VE further stated that all of these positions require some interaction with other people and the ability to work alongside peers.  (R. 66.)  Because these positions are unskilled, the VE testified that there would be interaction with supervisors at least three to five times a day.  (R. 67.)  The VE also testified that in such jobs, the individual might be called off-task to perform other duties.  (R. 68.)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

Because the Appeals Council denied review, the ALJ's findings constitute the final decision of the agency.  *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994).  The

findings of the ALJ as to any fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002); 42 U.S.C. § 1383 ("The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.") Although the court affords great deference to the ALJ, it must do more than merely rubber stamp the ALJ's decision. *Griffith v. Sullivan*, 916 F.2d 715 (7th Cir. 1990) citing *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). In order to affirm the ALJ's decision, the court must find the decision to be supported by substantial evidence on the record as a whole, and must take into account whatever in the record fairly detracts from its weight. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951). Substantial evidence is more than a mere scintilla; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kepple v. Massanari,* 268 F.3d 513 (7th Cir. 2001) citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court may not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that determination falls upon the ALJ, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the court may afford the claimant meaningful review of the ALJ's ultimate findings. *Pepper v. Colvin*, 712 F.3d 351 (7th Cir. 2013). It is not enough that

the record contains evidence to support the ALJ's decision and the court must remand if the ALJ does not rationally and sufficiently articulate the grounds for that decision, so as to prevent meaningful review. (*Id.*)

> **B.    Analysis under the Social Security Act**

To qualify for Social Security benefits, a claimant must be under a disability within the meaning of the Act.  42 U.S.C. § 423(a)(1)(E).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217–22 (2002).  Pursuant to the Act, a claimant is disabled only if his physical or mental impairments are of such severity that he is unable to do his previous work and cannot, when "considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).  Another agency requirement to receive disability insurance benefits is that a claimant must show he was disabled on or before the date his insured status expired.  *See* 20 C.F.R. § 404.130 for definition of disability insured status; *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process for determining whether a claimant is disabled.  20 C.F.R. § 404.1520(a).  The ALJ is required to make the following inquiries:

1.      Is the claimant presently engaging in ("SGA")?  20 C.F.R. § 404.1572 *et seq*.

2.      Does the claimant have a severe medically determinable physical or mental

impairment that interferes with basic work-related activities and is expected to last at

least 12 months?

3.      Does the impairment meet or equal one of a list of specific impairments

enumerated in the regulations? *See* 20 C.F.R. § Pt. 404, Subpt. I, App. 1.

4.      Is the claimant unable to perform his or her former occupation?

5.      Is the claimant unable to perform any other work?

20 C.F.R. § 404.1520(a)(4); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).  A

negative answer at any point, other than step three, ends the inquiry and leads to a

determination that a claimant is not disabled.  *Zalewski v. Heckler*, 760 F.2d 160, 162 n.

2 (7th Cir. 1985).  The claimant has the burden of establishing steps one through four.

At step five the burden shifts to the SSA to establish that the claimant is capable of

performing work.  *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

        **C.      ALJ's Determination**

        On November 26, 2013, the ALJ issued a written decision denying Claimant's

DIB application due to a finding that he is not disabled under the Social Security Act

("The Act").  As an initial matter, the ALJ found that Claimant met the insured status

requirements of the Act through December 31, 2017.  (R. 21.)  At step one, the ALJ

determined that Claimant has not engaged in substantial gainful activity ("SGA") since

June 9, 2012, the alleged onset date.  (*Id*.)  At step two, the ALJ found that Claimant is

suffering from the severe impairments of major depressive disorder, osteoarthritis of the

ankle, and anger management syndrome.  (*Id*.)  At step three, the ALJ determined that

the Claimant did not have an impairment or a combination of impairments that meet or medically equals the severity of one of the listed impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1.  (R. 22.)  Next, the ALJ assessed Claimant's RFC and determined that he could perform medium work except that he should have no commercial driving.  (R. 24.)  In addition, his work is limited to simple, routine, and repetitive tasks with no interaction with the public and only occasional, brief, and superficial interaction with coworkers for a discrete period of time.  (*Id.*)  The ALJ also found that Claimant is able to work independently and can only engage in brief and superficial task-focused interaction with supervisors.  (*Id.*)  Based on this RFC, the ALJ concluded that Claimant could not perform his past work, because it was performed at the skilled level.  (R. 30.)  But, at the final step, the ALJ determined that Claimant could perform jobs existing in significant numbers in the national economy, such as laundry laborer, transportation cleaner, and hospital cleaner.  (R. 30, 31.)

In making his determination, the ALJ gave great weight to the ME who was present at the hearing.  He believed that the ME thoroughly reviewed the records and that his testimony and opinion were overall consistent with Claimant's overall record. (R. 27.)  The ALJ gave little weight to one of the statements from Mr. Kitzis, because his position as a social worker did not make him an acceptable medical source, pursuant to 20 C.F.R. § 404.1513.  (R. 27.)  However, the ALJ gave great weight to Mr. Kitzis' October 8, 2013 opinion, as it was consistent with the overall objective evidence and with Claimant's testimony.  (R. 28.)  The ALJ also gave great weight to some of the medical opinions of Dr. Conroe, as they were consistent with the overall medical evidence.  However, he also gave little weight to several aspects of Dr. Conroe's reports

because they were "speculative" and "not tied to any objective findings." (R. 29.) The ALJ concluded that the evidence supports a finding that Claimant can perform simple, routine, and repetitive jobs. (R. 30.)

Claimant now argues that the ALJ erred for the following three reasons: (1) the ALJ's consideration of Claimant's social functioning was flawed; (2) the ALJ erred in his treatment of the medical opinions in the record; and (3) the ALJ erred in his credibility determination. We address each issue in turn below.

### D.    Social Functioning

Claimant begins by arguing that the ALJ erroneously assessed his social functioning. According to Claimant, the ALJ was incorrect when he attributed Claimant's moderate limitations in social functioning to a lack of hospitalizations for his major depression and anger issues. In taking issue with the ALJ's reasoning, Claimant cites to *Hampton v. Colvin*, No. 12 C 9300, 2013 WL 6577933 (N.D. Ill. Dec. 13, 2013) and contends that the ALJ should not have considered his lack of hospitalizations since "a claimant does not need to be hospitalized in order to show that he suffers from a disabling mental impairment." (*Id.*) While Claimant is correct that an individual need not necessarily undergo serious treatment or hospitalizations to be considered disabled, Claimant misreads the ALJ's decision on the issue of social functioning, which the Court finds to be supported by substantial evidence.

Again, at step two, the ALJ found Claimant's depressive disorder and anger management syndrome to be severe impairments. (R. 21.) At step three, the ALJ is tasked with determining whether Claimant's severe impairments meets or equals the requirements of a listing impairment. Here, the ALJ concluded that Claimant did not

meet the requirements of the listed impairments of 20 C.F.R. § Pt. 404, Subpt. I, App. 1, specifically 12.04 for depression and 12.08 for personality disorders. For both listings, the presence of depression and aggression must be accompanied by marked limitations in two of the following areas: (1) activities of daily living; (2) maintaining social functioning; (3) maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[1] 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The ALJ found that Claimant had only moderate difficulties in the area of social functioning and therefore did not meet the requirement of either listing 12.04 or 12.08. (R. 23.) Later, when assessing Claimant's RFC, the ALJ again considered his moderate limitations in social functioning and limited him to only occasional, brief and superficial interactions with coworkers and supervisors.

In reaching his conclusion at step three and in determining Claimant's RFC, the ALJ did not, contrary to Claimant's assertion, rely solely on a lack of hospitalizations. He also relied on the testimony of the ME at the hearing, as well as other evidence in the record from Claimant's own treating psychiatrist and social worker. Specifically, the ALJ recognized that Dr. Conroe and Mr. Kitzis identified some serious limitations in Claimant's ability to get along with coworkers, and maintain socially appropriate behavior. But when asked to rate Claimant's overall level of functioning in the category of maintaining social functioning, Mr. Kitzis selected "mild-none" and Dr. Conroe selected "moderate." The ALJ properly relied on this evidence, and the ME's testimony after reviewing the same, to conclude that Claimant had moderate limitations in social functioning. Further, we see no merit to Claimant's argument that a mark of "seriously

_____

[1] For listing 12.04, the listing may be met if a claimant fulfills the requirements of section C but that is not applicable to the instant case.

limited but not precluded" in certain abilities must equate to a "marked" limitation in overall social functioning. After reviewing the appropriate portion of the questionnaire, it is unequivocal that even Dr. Conroe and Mr. Kitzis found Claimant moderately limited, and not markedly limited, in the area of social functioning.

Claimant also takes issue with the ALJ's statement that "there is no[t] any indication in any of professional contacts that he has trouble managing his anger." (R. 23.) At the hearing, Claimant recounted several instances in which he was unable to control his temper at work. He testified that a few years ago, he was "getting intolerant of people…and would get really angry and blurt out almost uncontrollably." (R. 48.) Claimant also told the ALJ of a time in which he "snapped at a woman who was asking [Claimant] some questions" at a meeting with colleagues. (R. 55.) Though Claimant testified to his anger and outbursts, medical evidence corroborating his testimony is lacking and the ALJ was free to rely, at least in part, on this lack of evidence. And, although the ME acknowledged that there may be a "concern" if the ALJ placed "significant weight" on Claimant's allegations of rage, the ALJ provided limitations in his RFC based on the record as a whole to properly account for any such issues. The limitations are supported by the record, including evidence from Claimant's own psychiatrist and social worker.

The ALJ also properly incorporated the anger management issues into his step five conclusion when he accepted the VE's testimony that Claimant could perform jobs such as laundry laborer, transportation cleaner, or hospital cleaner. (R. 31, 63-64.) Claimant now contends that those jobs were unsuited for him because of the direct supervision that the jobs would require, the unpredictability of each job, and the fact that

the VE stated: "you would have to be able to get along with your coworkers.  That is the bottom line."  (R. 71.)  However, Claimant mischaracterizes the VE's testimony.  The VE testified that because of the unskilled nature of the work, supervision is unavoidable, but brief, which adheres to the ALJ's prescribed RFC.  With regard to the unpredictability of the position, the VE continuously affirmed the "relatively routine" nature of these positions and stated that he did not "see where the variability would come in."  (R. 68-70.)  He also opined that "there are no jobs where duties are exactly [the same]."  (R. 70.)  The VE also clarified his meaning with regard to interaction with coworkers, and stated that "there are no jobs where you work isolated…but there are no specific demands that they interact."  (R. 71.)  Moreover, in the mental impairment questionnaires completed by Dr. Conroe and Mr. Kitzis, neither doctor precluded work when assessing Claimant's mental abilities in unskilled, semiskilled, skilled work, or for particular jobs.  The only area in which Dr. Conroe marked Claimant "unable to meet competitive standards" is dealing with stress of semiskilled and unskilled work, but the ALJ accounted for this limitation because the jobs assigned were unskilled and low-stress.  (R. 67, 70, 328, 341.)  For all of these reasons, we see no error in the ALJ's assessment of Claimant's limitations in social functioning.

> ### E.    Opinion Evidence

Next, Claimant argues that the ALJ erred when he discounted Mr. Kitzis' December 18, 2012 medical source statement, which came in the form of a letter.  In his letter, Mr. Kitzis wrote that he had been providing Claimant counseling since November 3, 2011 and that Claimant had attended 38 appointments.  (R. 319.)  He further wrote that Claimant "reports extreme anxiety and inability to function in his most recent

employment. He reports being unable to concentrate, complete his work or interact appropriately with his coworkers at his most recent employment." (*Id.*) Mr. Kitzis concluded by adding that "while [Claimant] has found individual counseling useful and is currently in less distress, he reports that he is unable to return to the environment at his most recent employment." (*Id.*)

At the outset, we note, as did the ALJ, that Mr. Kitzis is not a medically acceptable source under the regulations for establishing a medically determinable impairment. *See* 20 C.F.R. § 404.1513. His opinions can, however, be used to assess the severity of Claimant's impairment and how it affects his ability to work. *Id*; *Richards v. Astrue*, 370 F. App'x 727, 731, n.2 (7th Cir. 2010). In any event, in rejecting Mr. Kitzis' December 18, 2012 statement, the ALJ relied in part on the fact that his underlying treatment records were not in the record. According to the Claimant, the ALJ should have attempted to collect additional records before rendering any opinion.

The Court recognizes that while a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record. *See Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991). However, the ALJ was not required to request additional evidence in this case. "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, the evidence, including that from Claimant's own treating sources, was adequate for the ALJ to find that Claimant was not disabled.[2] There was also no indication at the hearing that Claimant was having trouble

---

[2] Again, the record included some treatment notes from Dr. Conroe that were mostly illegible. Given Dr. Conroe's ultimate conclusions regarding Claimant's functional limitations (and the significant weight the ALJ afforded most of those conclusions), any decision by the ALJ not to seek additional clarification of the illegible records would amount to harmless error.

obtaining records from his treating sources, nor a request from counsel to leave the record open so that he could submit additional records.

Claimant also argues that the ALJ erred when he discredited Mr. Kitzis' December 2012 letter because Mr. Kitzis had opined on an issue specifically reserved for the Commissioner, *i.e.*, that Claimant could not return to his previous work environment. It is certainly true that the ALJ can reject medical opinions on issues specifically reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(d). What is more, the ALJ correctly noted that even if he accepted Mr. Kitzis' statement that Claimant could not return to his previous work, that statement is "consistent with [his] findings herein, as the RFC would prevent the claimant from returning to his past relevant work." (R. 28.) The ALJ also pointed out that Mr. Kitzis' letter was primarily based on Claimant's subjective complaints. Generally, an ALJ may reject opinion evidence that is based on such complaints and is inconsistent with other substantial evidence. *See Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) (where a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it); *see also Austin v. Barnhart*, 83 F. App'x 812, 815-16 (7th Cir. 2003).

On the whole, and contrary to Claimant's assertion, the Court finds that the ALJ properly considered all of the opinions from Mr. Kitzis and Dr. Conroe as required under the regulations. *See* 20 C.F.R. § 404.1527(c). He fully reviewed each opinion and, where appropriate, pointed out internal inconsistencies, inconsistencies with the record as a whole, and a lack of objective medical evidence. As for the findings he found to be consistent and supported by the record, the ALJ took those into consideration when fashioning the RFC and making his ultimate disability determination.

**F.     Credibility Determination**

Finally, Claimant takes issue with the ALJ's credibility determination.  As an initial matter, the SSA has recently updated its guidance about evaluating symptoms in disability claims.  *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016).  The new ruling eliminates the term "credibility" from the SSA's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character."  *Id.* at *1.  Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law.  *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993).  In determining whether a new rule constitutes a clarification or a change, courts give "great weight" to the stated "intent and interpretation of the promulgating agency."  *Id.* at 483.  Though a statement of intent is not dispositive, the courts defer to an agency's expressed intent to "clarify" a regulation "unless the prior interpretation…is patently inconsistent with the later one." *Id.*; *see also First Nat. Bank of Chicago v. Standard Bank and Trust*, 172 F.3d 472, 479 (7th Cir. 1999); *Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408 (7th Cir. 1987).

Here, the SSA has specified in its new SSR that its elimination of the term "credibility" in subjective symptom evaluation is intended to "clarify" its application of existing rules and to "more closely follow our regulatory language regarding symptom evaluation."  SSR 16-3p, 2016 WL 1119029 at *1.  Moreover, the two SSRs are not patently inconsistent.  Indeed, a comparison of the two reveals substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms.  *Compare* SSR 16-3p

and SSR 96-7p.  Stated differently, "[t]he agency has had only one position, although it has expressed that position in different words."  *Homemakers N. Shore, Inc.,* 832 F.2d at 413.  Therefore, it is appropriate to evaluate Claimant's credibility argument in light of the guidance the Administration has provided in SSR 16-3.

It remains the case that because the ALJ is in the best position to determine a witness's truthfulness and forthrightness, the court will not overturn an ALJ's credibility determination unless it is "patently wrong."  *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012).  Under SSR 16-3, the ALJ must still consider all of an individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the record.  In assessing symptoms, the ALJ should consider elements such as "objective medical evidence of the impairments, the daily activities, allegations of pain and aggravating factors, functional limitations, and treatment (including medication)."  *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006); SSR 16-3, 2016 WL 1119029.

Turning to Claimant's argument on credibility here, he mainly argues that the ALJ improperly discredited Claimant's headaches when fashioning the RFC.   Of course, the RFC is an assessment of what work-related activities the claimant can perform despite his limitations.  *Young*, 362 F.3d 995 at 1000-01 (*citing Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 C.F.R. § 404.1545(a)(1) ("Your RFC is the most you can still do despite your limitations.")  The RFC must be assessed based on all the relevant evidence in the record.  20 C.F.R. § 404.1545(a)(1).  In determining an individual's RFC, "the ALJ must evaluate all limitations that arise from medically determinable

impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).

Here, the ALJ concluded that Claimant's headaches were not a severe impairment at step two. In doing so, he cited to Claimant's own testimony that his headaches can be controlled with medication. The ALJ acknowledged that Claimant complained that his Imitrex medication makes him aggressive, but that overall he had excellent response to the medication when needed. He also testified at the hearing that taking Excedrin can stop his headaches before they get to severe, thereby limiting his need for Imitrex. More importantly, the ALJ noted that "there is no objective showing that the claimant's migraines would cause more than minimal functional limitations." (R. 22.) To be clear, Claimant has not cited to any evidence showing that his headaches cause functional limitations above and beyond the limitations the ALJ otherwise afforded him in the RFC determination. *See Capman v. Colvin*, 617 F. App'x 575, 580 (7th Cir. 2015) (the ALJ did not have to include a limitation for the effects of Capman's migraines on his ability to work because Capman submitted no evidence that his headaches had worsened or impaired his ability to work); *see also Pepper*, 712 F.3d 351 at 364 (there is no evidence of Pepper's eye impairments substantially worsening or altering her ability to work during the relevant claim period, which could have altered the ALJ's determination.) Ultimately, the ALJ correctly found that the evidence did not support the Plaintiff's complaints of the severity of his headaches to the point where it would affect his ability to work. As such, we cannot say that the ALJ's determination on this issue, or his assessment of Claimant's symptoms generally, was patently wrong.

**IV.    CONCLUSION**

For the foregoing reasons, Claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.  It is so ordered.

**Michael T. Mason**
**United States Magistrate Judge**

**Dated: April 27, 2016**